**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM and NS PENSION PUBLIC EQUITY FUND, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PRIMORIS SERVICES CORPORATION, KOTI VADLAMUDI, DAVID KING, KEN DODGEN, and JEREMY KINCH,<br><br>Defendants. | Civil Action No. 3:26-cv-02416<br><br>DEMAND FOR JURY TRIAL<br><br><u>CLASS ACTION</u> |

**COMPLAINT-CLASS ACTION FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

1

Plaintiffs Boston Retirement System and NS Pension Public Equity Fund ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included a review of the Defendants' (as defined herein) public filings, conference calls, press releases, and announcements, as well as wire and press releases published by and regarding Primoris Services Corporation ("Primoris" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action brought on behalf of a "Class" of all persons or entities that purchased or otherwise acquired Primoris common stock between August 5, 2025 and June 22, 2026, inclusive (the "Class Period").  Plaintiffs seek to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Primoris is an infrastructure services company that provides engineering, procurement, construction, and maintenance services to customers in the utilities, energy, and infrastructure markets.  During the Class Period, Primoris' Energy segment generated a majority of the Company's revenue, with its renewable energy business serving as a significant contributor. Because Primoris performed much of its renewable energy work under fixed-price construction contracts, its profitability depended on accurately estimating project costs and controlling expenses, as the Company generally bore the risk of cost overruns.

3.    This case is about how Defendants misled Primoris investors by representing that the Company maintained "disciplined bidding," "well-developed estimating processes," effective

2

project controls, and reliable cost forecasting that enabled it to accurately price and execute fixed-price renewable energy projects, "manage risk," and reliably forecast revenues, margins, and earnings. In reality, Defendants failed to disclose that Primoris' estimating, cost-to-complete forecasting, and project oversight processes were deficient, causing the Company to systematically underestimate project costs and risks on multiple significant renewable energy projects.

4. As a result of these deficiencies, Primoris systematically understated expected project costs and overstated expected project profitability, delaying the recognition of material cost overruns and margin deterioration. Consequently, Defendants lacked a reasonable basis for the Company's financial guidance and their repeated assurances regarding its estimating processes, project execution, and financial outlook.

5. The truth was revealed through a series of disclosures between February 23, 2026 and June 22, 2026, culminating in Primoris' announcement that an internal review, supported by an independent third-party industry expert, had identified significant cost overruns, project delays, and execution challenges affecting six renewable energy projects. The Company sharply reduced its 2026 financial guidance and Renewables revenue outlook and announced the resignation of Defendant Kinch as Chief Operating Officer. On this news, Primoris' stock price *fell 21.6%, from $108.34 to $84.95.*

6. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of Primoris common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The Company's Principal Executive Office is located in this Judicial District.

10.     In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

11.     Plaintiffs, as set forth in the accompanying Certifications, which are incorporated by reference herein, purchased Primoris common stock during the Class Period and were damaged as a result of Defendants' wrongdoing alleged in this complaint.

12.     Defendant Primoris is a Delaware corporation headquartered in Dallas, Texas, that designs, builds, maintains, and upgrades critical energy and utility infrastructure, including electric grids, natural gas systems, renewable energy projects, pipelines, and communications networks, throughout the United States and Canada.  Primoris' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PRIM."

13.     Defendant Koti Vadlamudi ("Defendant Vadlamudi") became Primoris' President and Chief Executive Officer on November 10, 2025, and served in that capacity during the remainder of the Class Period.

14.     Defendant David King ("Defendant King") was at all relevant times Primoris' Chairman and served as Interim President and Chief Executive Officer from March 20, 2025 to November 10, 2025.

15. Defendant Ken Dodgen ("Defendant Dodgen") was at all relevant times Primoris' Executive Vice President and Chief Financial Officer.

16. Defendant Jeremy Kinch ("Defendant Kinch") was Primoris' Chief Operations Officer throughout the Class Period, until his departure on June 22, 2026.

17. Defendants Vadlamudi, King, Dodgen, and Kinch are sometimes collectively, in whole or in part, referred to herein as the "Individual Defendants."

18. The Individual Defendants possessed the power and authority to control the contents of Primoris' SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Primoris' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Primoris, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

19. The Company and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

20. Throughout the Class Period, Primoris' Energy segment, which included its renewable energy business, generated a majority of the Company's revenue and was a substantial portion of its earnings. The renewable energy business provided engineering, procurement,

construction, and maintenance services for utility-scale solar facilities, battery energy storage systems, and other renewable energy infrastructure projects.

21.    Primoris performed a substantial portion of its renewable energy work under fixed-price construction contracts, under which it generally agreed to perform specified work for a negotiated price and bore the risk that actual project costs could exceed its estimates.  Accordingly, the Company's profitability depended on accurately estimating project costs when preparing bids and effectively managing those costs during project execution.

22.    Primoris accounted for these contracts under Generally Accepted Accounting Principles ("GAAP") using a cost-to-cost input method, recognizing revenue over time based on costs incurred relative to total estimated costs at completion.  Under this method, the amount of revenue and gross profit recognized in each reporting period depended on management's estimates of total project costs.  GAAP and Primoris' disclosed accounting policies required the Company to reassess estimated project costs and profitability each reporting period and recognize the financial impact of any material changes through cumulative catch-up adjustments in the period those changes became known.

23.    Accordingly, accurate cost estimation and timely cost-to-complete forecasting were fundamental to Primoris' accounting and financial reporting.  Because estimated total project costs directly determined the timing and amount of revenue, gross profit, and income recognized on these contracts, the Company's reported financial results and financial guidance depended on its ability to reasonably estimate and timely update those costs.

**B.**    **Defendants' False and Misleading Statements**

*Q2 2025 Earnings*

24.    After the market closed on August 4, 2025, Primoris issued a press release reporting its financial results for the second quarter of 2025.[1]  The Class Period begins on August 5, 2025, the following trading day.  In the press release, Primoris reported second-quarter revenue of $1.9 billion, gross profit of $231.7 million, and adjusted earnings before interest, income taxes, depreciation and amortization ("Adjusted EBITDA") of $154.8 million.  For its Energy segment, Primoris reported second-quarter revenue of $1.2 billion, gross profit of $134.2 million, and operating income of $92.6 million.  Primoris also issued full-year 2025 guidance of net income between $241 million and $252 million and Adjusted EBITDA between $490 million and $510 million.  Regarding its second-quarter margin performance, the Company stated:

> Gross profit as a percentage of revenue decreased to 10.8 percent during the three months ended June 30, 2025, compared to 12.6 percent in the same period in 2024. The decrease in gross margin was primarily due to a more favorable impact from the closeout of renewables projects in 2024 and increased costs for certain renewables projects in 2025 due in part to unfavorable weather conditions.

25.    On the same day, Primoris filed its Quarterly Report on Form 10-Q for the second quarter of 2025 with the SEC, incorporating by reference the risk disclosures contained in its Annual Report on Form 10-K for the fiscal year ended December 31, 2024.  Therein, the Company purported to warn investors of risks that "could" or "may" adversely affect its business and financial results, including the following:

> ***We may lose business to competitors through the competitive bidding processes***. We are engaged in highly competitive businesses in which some customer contracts are awarded through bidding processes based on price and the acceptance of certain risks, along with other factors. We compete with other infrastructure services contractors, both regional and national, as well as small local contractors. The strong competition in our markets ***requires maintaining skilled personnel*** and investing in technology, which can put pressure on profit margins. We do not obtain

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

contracts from all of our bids and ***our inability to win bids at acceptable profit margins would adversely affect our business***.

                      *                       *                     *

***We may be unsuccessful at generating organic growth which may affect our ability to expand our operations or grow our business.*** Our ability to generate organic growth may be affected by, among other factors, our ability to: attract new customers; increase the number of projects performed for existing customers; ***hire and retain qualified personnel; secure appropriate levels of construction equipment; successfully bid for new projects***; and adapt the range of services we offer to address our customers' evolving construction needs.

                      *                       *                     *

***Our actual cost may be greater than expected in performing our contracts causing us to realize significantly lower profit or losses on our projects.*** We currently generate, and expect to continue to generate, a substantial portion of our revenue from fixed price and unit price contracts. ***The actual cost of labor and materials may vary from the costs we originally estimated, and we may not be successful in recouping additional costs from our customers. These variations may cause gross profit for a project to differ from those we originally estimated.*** Reduced profitability or losses on projects could occur due to changes in a variety of factors such as: ***failure to properly estimate costs of engineering, materials, equipment or labor***; unanticipated technical problems with the structures, materials or services being supplied by us, which may require that we spend our own money to remedy the problem; project modifications not reimbursed by the client creating unanticipated costs; changes in the costs of equipment, materials, labor or subcontractors; our suppliers or subcontractors failing to perform; changes in local laws and regulations; and delays caused by weather. As projects grow in size and complexity, multiple factors may contribute to reduced profit or losses, and depending on the size of the particular project, variations from the estimated contract costs could have a material adverse effect on our business.

                      *                       *                     *

***Our business may be affected by difficult work sites and environments which may adversely affect our ability to procure materials and labor.*** We perform our work under a variety of conditions, including, but not limited to, difficult and hard to reach terrain, difficult site conditions, and busy urban centers, where delivery of materials and availability of labor may be impacted. Performing work under these conditions can slow our progress, potentially causing us to incur contractual liability to our customers. These difficult conditions may also cause us to incur additional, unanticipated costs that we might not be able to pass on to our customers.

                      *                       *                     *

*Our accounting for revenue recognized over time could result in a reduction or elimination of previously reported revenue and profit.* For contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value, we recognize revenue over time as work is completed because of the continuous transfer of control to the customer (typically using an input measure such as costs incurred to date relative to total estimated costs at completion to measure progress). Accounting for long-term contracts involves the use of various techniques to estimate total transaction price and costs. *For long-term contracts, transaction price, estimated cost at completion and total costs incurred to date are used to calculate revenue earned. Unforeseen events and circumstances can alter the estimate of the costs and potential profit associated with a particular contract. Total estimated costs, and thus contract revenue and income, can be impacted by changes in productivity, scheduling, the unit cost of labor, subcontracts, materials and equipment. Additionally, external factors such as weather, client needs, client delays in providing permits and approvals, labor availability, governmental regulation, and politics may affect the progress of a project's completion, and thus the timing of revenue recognition. Actual results could differ from estimated amounts and could result in a reduction or elimination of previously recognized earnings*. In certain circumstances, it is possible that such adjustments could be significant and could have an adverse effect on our business.

26.    The next day, August 5, 2025, Primoris conducted an earnings call to discuss its second-quarter 2025 results.  On the call, Defendant King stated that "[t]here is an *enormous amount of upcoming work that fits very well with our capabilities without having to expose ourselves to unnecessary risk on large lump sum projects with potentially less attractive margins.*"  Defendant King further stated that Primoris' "*focus on disciplined bidding and project execution while managing risk will enable us to expand margins and increase cash flow.*"  In response to an analyst's question regarding solar revenue and bookings, Defendant Dodgen stated that Primoris' increased revenue guidance reflected "*good performance and timing of execution on the jobs*," and that "*none of it*" was attributable to tariffs or the One Big Beautiful Bill, a federal budget and tax law signed into law in July 2025.

*Q3 2025 Earnings*

27.    After the market closed on November 3, 2025, Primoris issued a press release reporting its financial results for the third quarter of 2025.  In the press release, Primoris reported

9

third-quarter revenue of $2.2 billion, gross profit of $235.7 million, and Adjusted EBITDA of $168.7 million.  For its Energy segment, Primoris reported third-quarter revenue of $1.5 billion, gross profit of $149.7 million, and operating income of $108.6 million.  Primoris also issued updated full-year 2025 guidance of net income between $260.5 million and $271.5 million and Adjusted EBITDA between $510 million and $530 million.  Regarding its third-quarter margin performance, the Company stated:

> Gross profit as a percentage of revenue decreased to 10.1% during the three months ended September 30, 2025, compared to 11.0% in the same period in 2024, attributable to a more favorable impact from the close out of multiple renewables and industrial projects in 2024. In addition, we experienced increased costs in 2025 on certain renewables projects due in part to unfavorable weather conditions.

28.    On the same day, Primoris filed its Quarterly Report on Form 10-Q for the third quarter of 2025 with the SEC, incorporating by reference the risk disclosures contained in its Annual Report on Form 10-K for the fiscal year ended December 31, 2024.  Therein, the Company purported to warn investors of risks that "could" or "may" adversely affect its business and financial results, repeating the same risk factors set forth in ¶ 25, including risks associated with competitive bidding, inaccurate cost estimates, cost overruns on fixed-price contracts, difficult work sites and project conditions, and changes in estimated contract costs and profitability.

29.    The next day, Primoris conducted an earnings call to discuss its third-quarter 2025 results.  During the call, an analyst asked Defendant King whether delays in signing Energy segment projects were more concentrated in renewables or pipelines. Defendant King responded:

> [I]t's more on the renewable side. As we were looking – as you know, all that noise that we were getting out there on the One Big Beautiful Bill and the tariffs, ***it was causing some of our customers to look at a lot of different supply chains, which means that we had to redo some engineering and look at – before we could really firm up our cost to them***. And so it wasn't a matter I think I said on my earnings call that we lost any projects or any projects were delayed – not delayed, but any projects were canceled. It was a matter of, ***we needed that extra timing and so did the customers to get the right supply chain in so we could firm up the price and***

10

*get ready to sign those projects.* And then indeed, that's what we're talking about happening in Q4 and then also in Q1.

<u>Goldman Sachs Conference</u>

30.    On January 7, 2026, at the Goldman Sachs Energy, CleanTech & Utilities Conference, Defendant Kinch assured investors that Primoris managed project risk by pursuing projects within its expertise and growing only at a pace consistent with its ability to execute successfully.  Defendant Kinch stated:

> [G]enerally, we don't do kind of $1 billion projects typically. Like, well, *that kind of $80 million to $400 million is kind of our sweet spot, and we're finding the opportunities with the simple cycle projects that are falling into that category. And so it helps us manage risk.* And the burn time on those jobs is kind of in the area we know how to manage. And downside is you need more teams to do this, the same amount of revenue or to grow. But again, I think on the whole, *we've been able to manage that well and we've been able to attract people. And frankly, we'll grow in line with our ability to execute with surety. I'd say we don't want lost projects. And it – you can erase a lot of good work with a bad job. So it's making sure that we're growing with assurance around our execution. That remains the priority.*

<u>CJS Securities Conference</u>

31.    On January 14, 2026, at the CJS Securities New Ideas for the New Year Investor Conference, Defendant Kinch described Primoris' disciplined bidding and risk management processes, telling investors that the Company carefully selected projects, maintained "*well-developed estimating processes that have held up over the test of time,*" and pursued projects that it understood and could execute successfully.

32.    Later during the conference, in response to a question concerning bid margins, Defendant Kinch told investors that Primoris' contract structure and understanding of project scope enabled it to appropriately price projects and improve margins through execution rather than assuming unknown risks. Specifically, Kinch stated:

> What we're seeing more so than maybe bid margins going up, *we're seeing a lot more equitable contract terms, the form of contract, which allows us to work on*

11

*a reimbursable basis while the engineering's in the early stage and procurement's happening*. And as we with the client develop the scope at around 60% engineering, when delivery times are known, then we're able to provide a fixed price for the remainder. And with the – call it, the equitable contract terms and our better understanding of the scope at that point, *we've got an opportunity to improve on our bid margin through execution because a lot of the unknowns are worked out at that point.*

33. Defendant Kinch further represented that Primoris had established bidding and execution processes that mitigated project risk, stating that **"*we have the work processes in place to estimate correctly and then to go out and execute the work correctly . . . I think that's a good way to mitigate risk.*"**

34. The statements above in ¶¶ 24-33 were materially false and misleading when made because, at the time, Defendants knew or recklessly disregarded that: (i) Primoris' cost estimation, cost-to-complete forecasting, and project oversight processes were deficient and failed to provide reliable estimates of the costs and expected profitability of significant fixed-price renewable energy projects; (ii) as a result, Primoris systematically underestimated the costs and risks of significant fixed-price renewable energy projects that were experiencing material cost overruns, execution problems, and schedule delays; and (iii) accordingly, Defendants' statements regarding the Company's estimating processes, project execution, ability to manage project risk, financial performance, and financial guidance lacked a reasonable basis and omitted material adverse facts.

**C.     The Truth Emerges as Defendants Continue to Mislead Investors**

*Q4 2025 Earnings*

35. After the market closed on February 23, 2026, Primoris issued a press release reporting its fourth-quarter and full-year 2025 financial results. In the press release, Primoris disclosed increased costs on certain renewable energy projects, more challenging-than-anticipated soil conditions, and margin compression within its Energy segment, acknowledging that these issues adversely affected fourth-quarter profitability despite higher revenue. On this news,

12

Primoris' stock price declined approximately **8%**, closing at $151.92 per share on February 24, 2026.

36.    Despite these disclosures and the resulting stock-price decline, Defendants continued to mislead investors by reporting fourth-quarter revenue of $1.86 billion, gross profit of $175.0 million, and Adjusted EBITDA of $108.2 million, while issuing optimistic 2026 guidance projecting Adjusted EPS of $5.80 to $6.00 and Adjusted EBITDA of $560 million to $580 million and assuring investors that the Company remained positioned for continued growth.  Thus, the February 23, 2026 disclosures revealed only part of the truth because Defendants continued to conceal the extent of the Company's estimating and project execution deficiencies and continued to report financial results and issue financial guidance that understated the impact of those deficiencies on the Company's margins, profitability, and expected financial performance.

37.    The same day, Primoris filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2025 with the SEC.  The Form 10-K purported to warn investors of risks that "could" or "may" adversely affect the Company's business and financial results, including the following:

> ***We may lose business to competitors through the competitive bidding processes.*** We are engaged in a competitive business in which some customer contracts are awarded through bidding processes based on price and the acceptance of certain risks, along with other factors. We compete with other infrastructure services contractors, both regional and national, as well as small local contractors. The strong competition in our markets ***requires maintaining skilled personnel*** and investing in equipment and technology, which can put pressure on profit margins. We do not obtain contracts from all of our bids and ***our inability to win bids at acceptable profit margins would adversely affect our business***. ***Additionally, an increase in competition may result in a decrease in new awards, a decrease in profit margins, or both***.
>
> *                    *                    *
>
> ***We may be unsuccessful at generating organic growth which may affect our ability to expand our operations or grow our business.*** Our ability to generate organic growth may be affected by, among other factors, our ability to: attract new

customers; increase the number of projects performed for existing customers; *hire and retain qualified personnel; secure appropriate levels of construction equipment; successfully bid for new projects*; and adapt the range of services we offer to address our customers' evolving construction needs.

*          *          *

*Our actual cost may be greater than expected in performing our contracts causing us to realize significantly lower profit or losses on our projects.* We currently generate, and expect to continue to generate, a substantial portion of our revenue from fixed price and unit price contracts. *The actual cost of labor and materials may vary from the costs we originally estimated, and we may not be successful in recouping additional costs from our customers. These variations may cause gross profit for a project to differ from those we originally estimated. Our profitability is therefore dependent upon our ability to accurately estimate the costs associated with our services and our ability to execute in accordance with our plans.* Reduced profitability or losses on projects could occur due to changes in a variety of factors such as: *failure to properly estimate costs of engineering, materials, equipment or labor*; unanticipated technical problems with the structures, materials or services being supplied by us, which may require that we spend our own money to remedy the problem; project modifications not reimbursed by the client creating unanticipated costs; changes in the costs of equipment, materials, labor or subcontractors; our suppliers or subcontractors failing to perform; changes in local laws and regulations; and delays caused by weather. As projects grow in size and complexity, multiple factors may contribute to reduced profit or losses, and depending on the size of the particular project, variations from the estimated contract costs could have a material adverse effect on our business.

*          *          *

*Our business may be affected by difficult work sites and environments which may adversely affect our ability to procure materials and labor.* We perform our work under a variety of conditions, including, but not limited to, difficult and hard to reach terrain, difficult site conditions, and busy urban centers, where delivery of materials and availability of labor may be impacted. Performing work under these conditions can slow our progress, potentially causing us to incur contractual liability to our customers. These difficult conditions may also cause us to incur additional, unanticipated costs that we might not be able to pass on to our customers.

*          *          *

*Our accounting for revenue recognized over time could result in a reduction or elimination of previously reported revenue and profit.* For contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value, we recognize revenue over time as work is completed because of the continuous

14

transfer of control to the customer (typically using an input measure such as costs incurred to date relative to total estimated costs at completion to measure progress). Accounting for long-term contracts involves the use of various techniques to estimate total transaction price and costs. ***For long-term contracts, transaction price, estimated cost at completion and total costs incurred to date are used to calculate revenue earned. Unforeseen events and circumstances can alter the estimate of the costs and potential profit associated with a particular contract. Total estimated costs, and thus contract revenue and income, can be impacted by changes in productivity, scheduling, the unit cost of labor, subcontracts, materials and equipment. Additionally, external factors such as weather, client needs, client delays in providing permits and approvals, labor availability, governmental regulation, and politics may affect the progress of a project's completion, and thus the timing of revenue recognition. Actual results could differ from estimated amounts and could result in a reduction or elimination of previously recognized earnings***. In certain circumstances, it is possible that such adjustments could be significant and could have an adverse effect on our business.

38.    The following day, February 24, 2026, during the related earnings call, Defendants continued making materially false and misleading statements regarding the Company's estimating processes, project execution, profitability, and financial guidance. For example, Defendant Vadlamudi told investors that "***[o]ur teams are using and developing tools that can assist our teams in managing project risk and contracts, improving cost estimates and scheduling, and are increasing our productivity and predictability in the benefit of Primoris and our clients.***"

39.    Defendant Vadlamudi further assured investors that "***[w]e remain disciplined in the types of projects we are pursuing and the terms we are willing to accept to balance risk more equitably between contractor and client, and ensure the jobs are completed successfully and on schedule.***" Defendant Vadlamudi further stated:

> ***We believe we have worked past most of the excess costs on these projects and would expect to see margins improve in 2026 and return to the norms we expect. We have also continued to add quality people and management oversight to assist with upfront engineering, design, and estimating work that will help mitigate excursions in the future.***

40.    The statements above in ¶¶ 36-39 were materially false and misleading when made because, at the time, Defendants knew or recklessly disregarded that: (i) Primoris' cost estimation,

15

cost-to-complete forecasting, and project oversight processes were deficient and failed to provide reliable estimates of the costs and expected profitability of significant fixed-price renewable energy projects; (ii) as a result, Primoris systematically underestimated the costs and risks of significant fixed-price renewable energy projects that were experiencing material cost overruns, execution problems, and schedule delays; and (iii) accordingly, Defendants' statements regarding the Company's estimating processes, project execution, ability to manage project risk, financial performance, and financial guidance lacked a reasonable basis and omitted material adverse facts.

### *Q1 2026 Earnings*

41.     After the market closed on May 5, 2026, Primoris issued a press release reporting its financial results for the first quarter of 2026.  In the press release, Primoris disclosed additional adverse developments affecting its renewable energy business, including revenue and margin pressure, delayed project starts, and weaker-than-expected first-quarter 2026 results.   The Company also reduced its full-year 2026 Adjusted EPS guidance from $5.80-$6.00 to $4.80-$5.00 and lowered its Adjusted EBITDA guidance.   On this news, Primoris' stock price declined approximately **50%**, closing at $101.23 per share on May 6, 2026.

42.     Although the May 5, 2026 disclosures revealed significant problems affecting Primoris' renewable energy business and prompted a substantial stock price decline, Defendants continued to mislead investors by assuring them that the affected projects were largely behind the Company and by continuing to report financial results and issue financial guidance that understated the impact of the Company's estimating and project execution deficiencies.  Accordingly, the May 5, 2026 disclosures did not reveal the full extent of those deficiencies or their impact on the Company's profitability and expected financial performance.

43.     On the same day, Primoris filed its Quarterly Report on Form 10-Q for the first quarter of 2026 with the SEC, incorporating by reference the risk disclosures contained in the

16

Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2025.  Therein, the Company purported to warn investors of risks that "could" or "may" adversely affect its business and financial results, repeating substantially similar risk factors to those set forth in ¶ 37, including risks associated with competitive bidding, inaccurate cost estimates, cost overruns on fixed-price contracts, difficult work sites and project conditions, and changes in estimated contract costs and profitability.

44.    The following day, during the related earnings call, Defendants continued making materially false and misleading statements regarding the Company's estimating processes, project execution, risk management, and profitability.  For example, when asked about margin pressure within Primoris' solar business, Defendant Vadlamudi assured investors that:

> *Most of the projects that had this margin compression are nearing substantial completion in the next few weeks and one in fourth quarter at the end of this calendar year. So, we feel pretty confident going forward that we've addressed the issues on these projects that were bid in 2024.*

45.    In response to a follow-up question regarding margin pressure within Primoris' solar business, Defendant Vadlamudi further assured investors, stating:

> *It's six projects in the total portfolio that are in this margin compression scenario. Three will complete in the next few weeks, one in the next quarter, and then one in Q4. So we feel pretty good about risk assessment of the overall portfolio, our ability to hit those target dates.*

46.    The statements above in ¶¶ 42-45 were materially false and misleading when made because, at the time, Defendants knew or recklessly disregarded that: (i) Primoris' cost estimation, cost-to-complete forecasting, and project oversight processes were deficient and failed to provide reliable estimates of the costs and expected profitability of significant fixed-price renewable energy projects; (ii) as a result, Primoris systematically underestimated the costs and risks of significant fixed-price renewable energy projects that were experiencing material cost overruns, execution problems, and schedule delays; and (iii) accordingly, Defendants' statements regarding

17

the Company's estimating processes, project execution, ability to manage project risk, financial performance, and financial guidance lacked a reasonable basis and omitted material adverse facts.

*Leadership Change Raises Further Concerns*

47.    After the market closed on June 8, 2026, Primoris issued a press release announcing that Anthony Vorderbruggen, the Company's President of Renewables, was departing the Company, effective immediately.

48.    Analysts recognized the significance of Vorderbruggen's departure. On June 9, 2026, Guggenheim Securities observed that the announcement "raises questions regarding PRIM's ongoing efforts to contain problems in the renewable energy business" and further noted that the Company "may not have fully scoped the ongoing challenges with the six solar projects that it had previously highlighted." On this news, Primoris' stock price declined approximately **15%**, closing at $103.90 per share on June 9, 2026.

*Business Update Further Reveals the Extent of the Problems*

49.    The truth about Primoris' fraud was further revealed on June 22, 2026, when Primoris issued a Business Update announcing that, following an internal review supported by an independent third-party industry expert, it had identified substantial challenges, cost overruns, and project delays affecting six renewable energy projects. The Company reduced its full-year 2026 Adjusted EPS guidance to $2.05-$2.60, lowered its Adjusted EBITDA guidance to $275 million-$325 million, projected that 2026 Renewables revenue would decline to approximately $2.1 billion, and announced the resignation of its Chief Operating Officer, Defendant Kinch. On this news, Primoris' stock declined approximately **22%**, closing at $84.95 per share on June 23, 2026.

*JP Morgan Conference*

50.    On June 24, 2026, after the close of the Class Period, Defendants Vadlamudi and Dodgen participated in the JP Morgan Natural Resources Conference, where Defendant

18

Vadlamudi acknowledged that Primoris had undertaken a comprehensive review of its renewable energy portfolio after replacing leadership and retaining an outside consultant. Defendant Vadlamudi stated:

> *[W]hen we saw the indication that the reforecast was going to drive a different number than we've previously reforecast, we . . . made the leadership change. With the leadership change and the outside consultant did a deeper review of the estimates to complete not just on the six, but the entirety of the portfolio.*

51.    Defendant Vadlamudi further acknowledged that, when Primoris negotiated the six renewable energy projects in 2024, the Company had underestimated the risks associated with those projects, stating:

> *[I]n some of the locations, we hadn't – we don't have a track record and didn't know the labor force very well or the jurisdictions that having authority. But, despite those risks, the team thought they had those captured and the client relationships suggested, hey, can you help us, and we went there.  So, I think there was probably a little bit of risk/reward balance that was underappreciated.*

52.    Defendant Vadlamudi further acknowledged that Primoris had failed to adequately staff key project oversight functions during 2024, explaining that "*[a]s [the Renewables business] grew, they were slow to increase functions like project controls, pre-construction, estimating, [and] project management.*"

53.    Defendant Vadlamudi also stated that Primoris had implemented additional reviews and strengthened its project management processes in response to the problems affecting the six renewable energy projects, explaining that "*we're doing a review to make sure we have the right project leadership in place, but it's a little bit more of a proactive measure just to make sure we don't have any other surprises.*"

## V.    ADDITIONAL SCIENTER ALLEGATIONS

54.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public

19

documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

55.     The Individual Defendants permitted Primoris to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

56.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Primoris, their control over, receipt, and/or modification of Primoris' allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Primoris, participated in the fraudulent scheme alleged herein.

57.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Primoris common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Primoris' business, operations, and management and the intrinsic value of Primoris common stock and caused Plaintiffs and members of the Class to purchase Primoris common stock at artificially inflated prices.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

58.     During the Class Period, as detailed herein, Primoris and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Primoris common stock, and operated as a fraud or deceit on Class Period purchasers of Primoris common stock by misrepresenting the value and

prospects for the Company's business and growth prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Primoris common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Primoris common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

59.    To the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

60.    Further, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased Primoris common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

61.    At all relevant times, the market for Primoris common stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, Primoris filed periodic public reports with the SEC;

(b)     Primoris regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Primoris was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Primoris common stock was actively traded on the NYSE.

62.     As a result of the foregoing, the market for Primoris common stock promptly digested current information regarding Primoris from all publicly available sources and reflected such information in Primoris' price.   Under these circumstances, all purchasers of Primoris common stock during the Class Period suffered similar injury through their purchase at artificially inflated prices and the presumption of reliance applies.

## VIII.   NO SAFE HARBOR

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

22

statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Primoris who knew that the statement was false when made.

## IX.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

64.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons other than Defendants who acquired Primoris common stock during the Class Period, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

66.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

68.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

23

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the price of Primoris common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5
### Promulgated Thereunder Against All Defendants

70. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

71. This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

24

72.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

74.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

75.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Primoris personnel to members of the investing public, including Plaintiffs and the Class.

76. As a result of the foregoing, the market price of Primoris common stock was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Primoris common stock during the Class Period in purchasing Primoris common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

77. Had Plaintiffs and the other members of the Class been aware that the market price of Primoris common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company common stock at the artificially inflated prices that they did, or at all.

78. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

79. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Primoris common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

80.    Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-69 as if fully set forth herein.

81.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, Defendants knew the adverse, non-public information concerning the Company's inadequate cost-estimation, cost-to-complete forecasting, and project oversight processes.

82.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

83.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

84.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of himself and the Class, pray for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiff and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 21, 2026

**KENDALL LAW GROUP, PLLC**
/s/ *Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Tel: (214) 744-3000
Fax: (214) 744-3015
jkendall@kendalllawgroup.com

*Texas Local Counsel for Plaintiffs*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville (*pro hac vice* forthcoming)
Connor C. Boehme (*pro hac vice* forthcoming)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiffs*

29